### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  SAG-22-366** |
| | * | |
| **ANNA GABRIELIAN &** | * | |
| **JAMIE LEE HENRY,** | * | |
| | * | |
| **Defendants.** | * | |
| | ****** | |

### GOVERNMENT'S REPLY MOTION IN LIMINE TO
### PRECLUDE MENTION OF ENTRAMENT IN OPENING STATEMENT

### BACKGROUND

We have a very simple rule: it's a rouble to get in, but two to get out.  That means that it's difficult to join the organization, but a lot more difficult to get out of it.  Theoretically, there's only one way out for any member of the organization – through the chimney of the crematorium.  For some it is an honorable exit, but for others it is a shameful and terrible way to go, but there's only one chimney for all of us . . .

The organization is giving you one last change to change your mind, a final opportunity to consider your choice. And to give you something to think about, I'll show you a film. Sit down . . .

On the screen there appears a high, gloomy room without windows, something between a factor workshop and a boiler house. In the foreground there is a furnace with fire-doors looking like the gates of a small castle, with grooves running into the furnace like rails into a tunnel.  People in grey protective gowns are standing near the furnace.  Boilermen.  Then they showed a coffin.  So this is a crematorium too. Probably the same one I have just been looking at out of the window. The men in gowns lift the coffin and place it on the guide rails.  The fire doors open smoothly to each side, the coffin is given a gentle push and it bears its unknown occupant into the roaring flames.  Then the camera gives a close-up of a living person.  A face swimming in perspiration. It is probably very hot near the furnace.  The face is displayed from all sides of what seems an eternity.  At last the camera pulls back to show the person in length.  He is not in a gown.  He is dressed in an expensive black suit, terrible crumpled.  His tie is tightly stretched found his neck. The man himself is bound fast with steal wire to a stretcher, and the stretcher has been propped up against the wall so that the man can see the furnace.

Next all the attendants suddenly turn their attention, to the bound man. Their attention obviously gives him no pleasure. He lets out a scream. A terrible scream. There is no sound, but I can tell it is a scream that would make the windows rattle

. . .

Then suddenly the stretcher comes to a halt at the furnace itself. . . . What is wrong? Why the hold-up? It soon becomes clear. Another coffin is wheeled into the crematorium on a law trolley. It is already nailed down and very elegant, with a decorative fringe.  It is the coffin of some highly esteemed person. Make way for it! The attendants lift it on the guide rails and send it on its last journey. Then there is an unbelievably long wait while it is consumed by flames.  At last it is the turn of the man bound to the stretcher, which is placed on the rails. And once again I hear that silent scream which is probably enough to lift the furnace door off its hinges. . . Then his patent leather shoes go into the fire, and that is that. . . .

'Who was he?' I don't really know why I ask such a question.

'He was a colonel, a former colonel. He worked in our organization in important posts. But he deceived us.  So he was turned out of the organization. And he left. That's the law here. We don't force anybody to come into the organization.  If you don't want to join you can simply refuse. But once you've joined you belong to the orgnisation lock, stock, and barrel. Along with your shoes and your tie. So there you are . . . I am giving you a last opportunity to change your mind. A minute to reflect.

'But I don't need a minute for reflection.'

'That's the rule. Even if you don't need that minute, the organization is obliged to let you have it.  So sit down and keep quiet.' . . . If they are going to admit me into that organization I am ready to serve it loyally.

-Victor Suvorov, *Inside the Aquarium, the Making of a Top Soviet Spy* (1987)

"Anna asked me to read inside *Inside the Aquarium"*

-Jamie Lee Henry, August 17, 2023

"Because it's the mentality of sacrificing everything . . . the mentality of sacrificing everything and loyalty in you from day one. That's not something you walked away from."

- Anna Gabrielian, August 17, 2023

If you have a useful long-term weapon, that can be used for years. If you use it for something that's not tactically advantageous, you've lost it for nothing. So if Henry can't practice medicine, can't be in the National Guard, you've lost an Anny doctor. If I have to look somebody up, and I do look somebody up, you've lost a link to [my employer] to establish those medical connections. It has to be something massively important, not just check if this person has polyps.

-Anna Gabrielian, August 17, 2023.

## ARGUMENT

The Defendants claim that they were entrapped by the UC, whom Gabrielian believed to be a "KGB" agent.[1]  But Defendants fail to grapple with the underlying fact that it was Gabrielian who instructed her husband – *before she ever met the UC* – to read a book about how to become a spy so that he could be capable of "sacrificing everything." It was Gabrielian – *before she ever met the UC* – who reached out to the Russian Embassy indicating that she and her security-cleared military spouse were ready to "help if there is a need" and that she did "not want Russia cut off from the international community," days after sanctions were imposed for the Russian invasion of Ukraine.  It was Gabrielian – *unprompted by the UC* – who brought up accessing medical information, stating to the UC that if she accessed medical information she could "be fired," and therefore "If we do give it [the information], then that's it. It shouldn't simply provide some abstract help."  ECF 54, at 7.

In other words, contrary to Defendant Gabrielian's contentions, she did not deny wanting to pass on medical information to the UC – she just cautioned that doing so could result in her losing her job, and so she should do so only to achieve an important goal of the Russian

---

[1] The Defendants response is replete with references to the "KGB."  *See, e.g.*, ECT 73, at 2, 11, 13, 18, and 24.  But the KGB was dissolved over thirty years ago. *See* History.com, *KGB,* available at https://www.history.com/topics/european-history/kgb. ("The KGB was the primary security and intelligence agency for the Soviet Union from 1954 until the nation collapsed in 1991."). For purposes of the motion, the Government assumes the Defendant refers to the Federal Security Service, the "FSB." *See* Federation of American Scientists, *FSB History*, available at https://irp.fas.org/world/russia/fsb/history.htm ("the Federal Security Service (FSB - Federal'naya Sluzhba Bezopasnosti, previously known as Federal Counterintelligence Service - FSK) is one of the successors of the KGB,").

Government.  She would only break the law if there was a low chance she could get caught, and if it was worth it to the Russian Government.  In her own words, she and Henry were a "useful long term weapon." She was ready to help the Russian Government, "five years from now. Ten years from now. Count this as a long-term investment. It doesn't need to be nurtured."

To underscore their commitment to Russia, when Henry told the UC "until the United States actually declares war against Russia, I'm able to help as much as I want. At that point I'll have some ethical issues I have to work through." Gabrielian responded, "You'll work through those ethical issues."  In other words, Gabrielian was confident – even if the United States declared war – that she and Henry would still provide assistance. And Henry wasn't concerned about the legality of such assistance, but with "work[ing] through" any ethical issues.[2]

These are not the actions of a "naïve" doctor whose only goal was to provide information to Russia about how to conduct better ultrasounds in its hospitals.  They were the actions of a person who was – in Gabrielian' s own words "helping other governments."[3]  Indeed, Gabrielian compared herself to Anna Chapman, a convicted long term Russian spy.[4]  She had her husband read a book about joining Russian intelligence so he could understand the  "mentality of sacrificing everything." And then, when approached by the UC, Gabrielian *on her own* proposed providing medical records to the Russian government.  Dr. Gabrielian was not entrapped. She was given the opportunity to do exactly as she wanted. And she took it.

As for Henry, The Defendants' response provides no indication of why Henry was

---

[2] These words must be seen in the context of Henry's experience as a U.S. Army officer, because – as Henry certainly knew – assisting a country against whom the United States has declared war is among the gravest of offenses.  *See* 18 U.S.C. 2381 ("Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason.").
[3] August 24, 2022.
[4] On August 31, 2022, Gabrielian told the UC that "still think there is a 5% chance that you were specifically sent by the States. That would be horrible." Speaking of her fear of being caught and exposed by American authorities, Gabrielian said "I don't want to be Anna Chapman, either, you understand. . . how can you make it so that doesn't happen."

entrapped when he was merely responding to the instructions of Gabrielian. Gabrielian could not entrap Henry, because she is not an agent of the Government. And the Defendants do not plausible argue otherwise.

Throughout the interactions, the UC consistently emphasized that Gabrielian and Henry were there voluntarily. She began by telling Gabrielian in their first meeting: "my task it to collect information and pass it along." The UC never mentioned 'exposing' Gabrielian and Henry's conversations or implied any sort of blackmail. Indeed, she emphasized that "Obviously, as I told your wife before, we're not trying to, in any way, shape or form put you at risk, right? Or put you in a position where you sacrifice your whole life." And when the UC told Gabrielian and Henry "trust me, if we ever get to the point where they will perhaps have me pass you this type of request, it will be probably something that will be life changing, right?" Gabrielian replied, "And at that point I want my kids to have a nice flight to Turkey to go on vacation because I don't want to end up in jail here with my kids being held hostage as over my head."

The Defendants assert that "It is reasonable to infer that she could not report a Russian intelligence agent to U.S. authorities without risking KGB [sic] retaliation and damage to her reputation and career." ECF 73, at 2. But such reporting would be easy: the FBI's main number is listed on Google. And Gabrielian's husband held a security clearance in the United States Army. She could have easily turned to him to expose the "KGB" Agent. But she did not, because she had already instructed him to read a book about how to become a spy, so he could understand the "mentality of sacrificing everything."

The Defendants now argue that they were seeking only to provide "humanitarian assistance," ECF 73, at 1; 16, n.8. But this is patently false. Gabrielian herself described how "if it goes the wrong way – I mean, our story is splendid, we met for humanitarian aid. . . that will be

unpleasant. Not insurmountable." Gabrielian's 'splendid story' is no more credible now than when she proposed it as a cover for the UC in their first meeting.

## **CONCLUSION**

The Defendants clearly regret their actions now that they have been caught. *See* ECF 73, at 11. But facts are stubborn things, and the facts are these: the Defendants were ready to "sacrifice everything" to assist the Russian Government long before they ever met the UC.

The Government's motion should be granted.

Respectfully submitted,

Erek L. Barron
United States Attorney


By:    _____/s/_____
      Aaron S.J. Zelinsky
      P. Michael Cunningham
      Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day, a copy of the foregoing motion was electronically

filed via CM/ECF which provides notice to counsel of record.


_____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney