ASJZ/PMC: USAO#2022R00516

KOG 11/01/23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- BALTIMORE
'23 NOV 7 PM2:33

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. SAG-22-336 |
| v. | * | |
| | * | (Conspiracy, 18 U.S.C. § 371; Disclosure |
| ANNA GABRIELIAN and | * | of Individually Identifiable Health |
| JAMIE LEE HENRY, | * | Information, 42 U.S.C. § 1320d-6; Fraud |
| | * | and Related Activity in Connection with |
| Defendants. | * | Identification Documents, 18 U.S.C. § |
| | * | 1028(a)(7)) |
| | * | |

*****

**SECOND SUPERSEDING INDICTMENT**

**COUNT 1**
**(Conspiracy)**

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Superseding Indictment:

**Introduction**

1.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d, *et seq.*, was enacted, among other things, to limit the circumstances in which a patient's confidential medical information ("individually identifiable health information" or "IIHI") could be used, obtained, or disclosed. HIPAA's security and privacy regulations, codified at 45 C.F.R. § 160 and 164, apply to health care providers, among others, who transmit any health information in electronic form in connection with a transaction covered by the regulations. *See* 45 C.F.R. § 160, 102(a) and 160.013 (defining "covered entity"). HIPAA's criminal provision, 42 U.S.C. § 1320d-6, prohibits the use, acquisition, or disclosure of IIHI – maintained by a covered entity – without patient authorization, unless such use, acquisition, or disclosure was otherwise

1

permitted by HIPAA and its regulations.

2. Defendant **ANNA GABRIELIAN** ("**GABRIELIAN**"), a resident of Maryland, was an anesthesiologist licensed to practice medicine in Maryland. **GABRIELIAN** was a health care provider and a covered entity as defined by HIPAA and its regulations. *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.103. **GABRIELIAN** worked as an anesthesiologist at Medical Institution 1, located in Baltimore, Maryland.

3. Defendant **JAMIE LEE HENRY** ("**HENRY**"), a resident of Maryland, was **GABRIELIAN**'s husband and a Major in the United States Army. **HENRY** was a doctor who worked as a staff internist and was stationed at Fort Bragg, the home of the Army's XVIII Airborne Corps, headquarters of the United States Army Special Operations Command, and the Womack Army Medical Center. **HENRY** was a health care provider and a covered entity as defined by HIPAA and its regulations. *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.013. **HENRY** held a Secret level security clearance, which permits an individual to have access to information classified Secret, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security," according to Executive Order 13526.

4. On or about February 24, 2022, Russian President Vladimir Putin announced a "special military operation" into Ukraine. Immediately thereafter, Russian missiles struck Ukraine, and Russian military forces began a ground incursion into the country. That same day, U.S. President Joseph Biden characterized the Russian attack as "a brutal assault on the people of Ukraine without provocation, without justification, without necessity," and authorized additional sanctions against Russia. In announcing the sanctions, President Biden stated: "Some of the most powerful impacts of our actions will come over time as we squeeze Russia's access to finance and technology for strategic sectors of its economy and degrade its industrial capacity for years to come."

5. On or about August 17, 2022, an FBI Undercover Agent ("UC") approached **GABRIELIAN** and introduced herself by name. The UC told **GABRIELIAN** she was asked to contact **GABRIELIAN** about the assistance she offered a couple of months ago. **GABRIELIAN** asked if the UC was from the Russian Embassy, and the UC confirmed that she was.

6. **GABRIELIAN** then told the UC that she had previously reached out directly to the Russian Embassy by email and phone, offering Russia her and her husband **HENRY**'s assistance. **GABRIELIAN** also told the UC that although **HENRY** knew she was reaching out to the Russian Embassy on both their behalf, **GABRIELIAN** had never mentioned **HENRY**'s name in her interactions with the Russian Embassy, and **HENRY** could claim he was unaware of her actions if needed.

## The Conspiracy

7. From in or around August 17, 2022, through the present, in the District of Maryland and elsewhere, the defendants, **ANNA GABRIELIAN** and **JAMIE LEE HENRY**, did knowingly and unlawfully combine, conspire, confederate, and agree with each other to commit offenses against the United States, that is, to knowingly obtain and disclose IIHI maintained by a covered entity to another person, without patient authorization and for a reason other than permitted by HIPAA and its regulations, in violation of 42 U.S.C. § 1320d-6(a), with intent to transfer IIHI for malicious harm and personal gain, in violation of 42 U.S.C. § 1320d-6 (b)(3).

## **Object of the Conspiracy**

8. The object of the conspiracy was to provide IIHI related to patients at Fort Bragg and Medical Institution 1 to an individual that **GABRIELIAN** and **HENRY** believed to be working for the Russian Government, in order to assist the Russian government by demonstrating: 1) the level of **GABRIELIAN** and **HENRY's** access to IIHI of U.S. personnel, 2) **GABRIELIAN** and **HENRY's** willingness to provide IIHI to the Russian government, and 3) the potential for the

Russian government to gain insights into the medical conditions of individuals associated with the U.S. government and military, to exploit this information.

### Manner and Means of the Conspiracy

9. It was part of the conspiracy that **GABRIELIAN** and **HENRY** met with an individual they believed to be associated with the Russian government, but who was, in fact, an FBI Undercover Agent ("UC"), in order to convey to the UC their commitment to aid Russia, and to discuss ways in which they could help the Russian government.

10. It was further part of the conspiracy that **GABRIELIAN** and **HENRY** suggested to the UC that they obtain IIHI from the patient records at the United States Army and Medical Institution 1. **GABRIELIAN** and **HENRY** stated they could obtain the IIHI of U.S. military, associated military family members, and certain patients of Medical Institution 1, for the UC to pass to the Russian government.

11. It was further part of the conspiracy that **GABRIELIAN** and **HENRY** discussed with the UC the need for them to maintain "plausible deniability" regarding their interactions with the UC. **GABRIELIAN** suggested a cover story for their interactions, and a plan for **GABRIELIAN** and **HENRY's** children flee the U.S. quickly if **GABRIELIAN** and **HENRY** were told to act in a way that could expose their communications and actions to the U.S. government.

12. It was further part of the conspiracy that **GABRIELIAN** accessed electronic medical records and obtained IIHI related to patients of Medical Institution 1 who were associated with the U.S. government, including the spouse of a government employee and a military veteran, and transferred that IIHI to the UC so that it could be passed on to the Russian government.

4

13. It was further part of the conspiracy that **HENRY** obtained IIHI related to members of the U.S. Military and associated family members and transferred that IIHI to the UC so that it could be passed to the Russian government.

## Overt Acts

14. In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators performed and caused to be performed one of the following overt acts on or about the dates set forth below in the District of Maryland and elsewhere:

   a. On August 17, 2022, **GABBRIELAN** agreed to meet the UC, who claimed to be associated with the Russian Embassy, at the UC's hotel after work that day.

   b. Later that day, August 17, 2022, **GABRIELIAN** called the UC to reaffirm **GABRIELIAN** and **HENRY** were committed to helping Russia.

   c. Shortly thereafter on August 17, 2022, **GABRIELIAN** met the UC at a hotel in Baltimore, Maryland. During that meeting, **GABRIELIAN** told the UC she was motivated by patriotism toward Russia to provide any assistance she could to Russia. **GABRIELIAN** proposed potential cover stories for meeting the UC, in the event she was confronted by U.S. authorities about meeting with the UC.

   d. **GABRIELIAN** also told the UC during that meeting that **HENRY**, a military officer, was currently a more important source for Russia than she was, since **HENRY** had more helpful information, including on how the U.S. military establishes an army hospital in war conditions, and about previous training the U.S. military provided to Ukrainian military personnel.

   e. **GABRIELIAN** told the UC she wanted to schedule another meeting that evening if **HENRY** were able to attend.

   f. At approximately 5:45 pm, on August 17, 2022, **GABRIELIAN** called the UC and stated that **GABRIELIAN** and **HENRY** would arrive at the UC's hotel at approximately 8:30 pm.

g.  At approximately 8:10 pm on August 17, 2022, **GABRIELIAN** and **HENRY** met the UC in the UC's hotel room.

h.  During that meeting, **HENRY** explained to the UC he was committed to assisting Russia, and he had looked into volunteering to join the Russian Army after the conflict in Ukraine began, but Russia wanted people with "combat experience" and he did not have any.

i.  **HENRY** further stated: "the way I am viewing what is going on in Ukraine now, is that the United States is using Ukrainians as a proxy for their own hatred toward Russia."

j.  During that same meeting in the hotel room on August 17, 2022, **GABRIELIAN** instructed the UC on how she and **HENRY** could be most useful to Russia. Referring to herself and **HENRY**, **GABRIELIAN** stated:

> If you have a useful long-term weapon, that can be used for years. If you use it for something that's not tactically advantageous, you've lost it for nothing. So if [**HENRY**] can't practice medicine, can't be in the National Guard, you've lost an Army doctor. If I have to look somebody up, and I do look somebody up, you've lost a link to [my employer] to establish those medical connections. It has to be something massively important, not just check if this person has polyps.

k.  At another point during the meeting on August 17, 2022, **HENRY** and **GABRIELIAN** offered to provide the UC with private medical records from the U.S. Army and Medical Institution 1 in order to help the Russian government.

l.  During the same meeting, **GABRIELIAN** demanded that if she were to take an action that put her at significant risk of arrest, she wanted her and **HENRY'S** children to "have a nice flight to Turkey to go on vacation because I don't want to end in jail here with my kids being hostages over my head."

m.  During that same meeting, **GABRIELIAN** provided the UC with a proposed cover story, instructing the UC that the UC is "a delightful medical translator who has reached out to me

6

. . . and you want to talk with me about programs and how they can be expanded."

    n.    During that same meeting, **HENRY** indicated he was concerned about passing a background check for his security clearance, telling the UC: "I don't want to know your name . . . because I want plausible deniability too. In a security clearance situation they want to know names and people and all this stuff."

    o.    During the August 17, 2022 meeting, **HENRY** told the UC that **GABRIELIAN** had instructed him to read the book, "Inside the Aquarium."[1] **GABRIELIAN** stated she had instructed **HENRY** to read the book, "Because it's the mentality of sacrificing everything . . . and loyalty in you from day one. That's not something you walked away from."

    p.    During the August 17, 2022 meeting, **HENRY** explained to the UC: "My point of view is until the United States actually declares war against Russia, I'm able to help as much as I want. At that point, I'll have some ethical issues I have to work through." **GABRIELIAN** replied: "you'll work through those ethical issues."

    q.    On August 24, 2022, **GABRIELIAN** and the UC met at a hotel room in Baltimore, Maryland. During that meeting, **GABRIELIAN** stated that **HENRY** "enjoys talking about things--- But when it comes to doing something, sometimes he is a little apprehensive. If I said I will do something, then I'll do it." **GABRIELIAN** further told the UC she would check with **HENRY** about providing medical records from Fort Bragg patients and get back in touch.

    r.    On August 25, 2022, **GABRIELIAN** sent a text to the UC, using coded language, to advise the UC that **HENRY** would provide Army medical records to the UC: "Jamie might have samples of his poetry laying around. He says he will look for them and decide if he has the

---

[1] The full title of the book is Victor Suvorov, "Inside the Aquarium: The Making of a Top Soviet Spy" (1986). The book describes the recruitment and training of a Russian spy inside the headquarters of the Main Intelligence Directorate of the then-Soviet Union (nicknamed "The Aquarium").

bandwidth for another project over the weekend. I think it would be good for him to at least show you examples of his past work."

 s. On August 31, 2022, during a meeting with the UC and **HENRY** at a hotel in Gaithersburg, Maryland, **GABRIELIAN** provided the UC with IIHI related to N.Z., the spouse of a person currently employed by the Office of Naval Intelligence, and IIHI related to A.R., a veteran of the United States Air Force.

 t. **GABRIELIAN** showed the UC which information in the medical records would be of more interest to Russia.

 u. During that same meeting on August 31, 2022, **HENRY** provided the UC with IIHI related to at least five individuals who were patients at Fort Bragg, including:

- K.P, a retired Army officer;
- K.W., a current Department of Defense employee;
- C.C., the spouse of a U.S. Army veteran;
- D.H., the spouse of a deceased U.S. Army veteran; and
- B.B., the spouse of a deceased U.S. Army veteran.
- A.H., an active-duty member of the U.S. Army.

18 U.S.C. § 371

## COUNTS TWO AND THREE
(Wrongful Disclosure of Individually Identifiable Health Information)

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 - 6 and 8 - 14 of Count One are re-alleged and incorporated here.

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant,

**ANNA GABRIELIAN**

did knowingly obtain and disclose individually identifiable health information maintained by a covered entity to another person, without patient authorization and for a reason other than permitted by HIPAA and its regulations, in violation of 42 U.S.C. §1320d-6(a), with intent to transfer individually identifiable health information for malicious harm and personal gain, in violation of 42 U.S.C. § 1320d-6(b)(3), as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF RECORD |
|---|---|---|
| 2 | August 31, 2022 | Medical notes regarding A.R. containing IIHI. |
| 3 | August 31, 2022 | Medical notes regarding N.Z. containing IIHI. |

42 U.S.C. § 1320d-6(a)
42 U.S.C. § 1320d-6(b)(3)

## COUNTS FOUR THROUGH NINE
(Wrongful Disclosure of Individually Identifiable Health Information)

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 - 6 and 8 - 14 of Count One are incorporated here.

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant

**JAMIE LEE HENRY**

did knowingly obtain and disclose individually identifiable health information maintained by a covered entity to another person, without patient authorization and for a reason other than permitted by HIPAA and its regulations, in violation of 42 U.S.C. §1320d-6(a), with intent to transfer individually identifiable health information for malicious harm and personal gain, in violation of 42 U.S.C. § 1320d-6(b)(3), as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF RECORD |
|---|---|---|
| 4 | August 31, 2022 | Medical notes regarding K.P. containing IIHI. |
| 5 | August 31, 2022 | Medical notes regarding K.W. containing IIHI. |
| 6 | August 31, 2022 | Medical notes regarding C.C. containing IIHI. |
| 7 | August 31, 2022 | Medical notes regarding D.H., containing IIHI. |

| 8 | August 31, 2022 | A list of current prescriptions for B.B. |
| 9 | August 31, 2022 | Medical notes regarding A.H., containing IIHI. |

42 U.S.C. § 1320d-6(a)
42 U.S.C. § 1320d-6(b)(3)

## COUNTS TEN AND ELEVEN
(Fraud and Related Activity in Connection with Identification Documents)

The Grand Jury for the District of Maryland further charges:

1. Paragraphs 1 - 6 and 8 - 14 of Count One are re-alleged and incorporated here.

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant,

## ANNA GABRIELIAN

did knowingly transfer, posses, and use, without lawful authority, the names, dates of birth and medical record numbers of other persons, as identified below, with the intent to disclose individually identifiable health information to another person, without patient authorization and for a reason other than permitted by HIPAA and its regulations, in violation of 42 U.S.C. §1320d-6(a), in circumstances where the transfer, possession, and use was in and affected interstate commerce, and the means of identification were transported by electronic means:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF MEANS OF IDENTIFICATION |
|---|---|---|
| 10 | August 31, 2022 | Name, date of birth, and medical record number of A.R. |
| 11 | August 31, 2022 | Name, date of birth, and medical record number of N.Z. |

18 U.S.C. § 1028(a)(7)

_[signature]_
Erek L. Barron
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 11/7/23